UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASSON HEDGEPETH,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>R. MADDEN,<br><br>　　　　　Respondent. | Case No.  20-cv-00858-BLF  (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |

　　　　Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his criminal judgment.  Dkt. Nos. 5 &14 ("Petition").  Respondent filed an answer, Dkt. No. 28 ("Answer"), and Petitioner filed a traverse, Dkt. No. 33 ("Traverse").  For the reasons set forth below, the Petition is **DENIED**.

## I.  BACKGROUND

　　　　A jury convicted Petitioner of first-degree murder and attempted voluntary manslaughter and found great bodily injury and firearm enhancements.  Ans., Ex. 1 at 1010-11.  Petitioner was sentenced to a total term of 50 years to life in prison.  *Id*. at 1097.  On September 25, 2019, the California Court of Appeal ("state appellate court") affirmed the judgment.  *See* Ans., Ex. 7; *see also People v. Hedgepeth*, No. A153257, 2019 WL 4668509 (Cal. Ct. App. Sept. 25, 2019).  On January 2, 2020, the California Supreme Court summarily denied review.  *See* Ans., Ex. 9.

　　　　Petitioner filed a habeas petition in the Alameda County Superior Court, which was denied on April 12, 2020.  *See* Dkt. No. 28-14 at 38-52.  Petitioner filed a second habeas petition in the Alameda County Superior Court, which was denied on August 4, 2020.  *See* Dkt. No. 14 at 4-25.[1]

---

[1] It also appears that Petitioner filed a habeas petition in the state appellate court, which was summarily denied on July 23, 2020.  *See* Dkt. No. 14 at 9.  While the Court has not been provided a copy of the state appellate court's summary denial, the state superior court refers to the date of

Petitioner filed a habeas petition with the California Supreme Court, which was denied on January 13, 2021. Ans., Ex. 12.

On or about March 3, 2020, Petitioner filed the instant habeas petition.[2] Pet.

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the state appellate court on direct appeal:

> At trial in August 2017, undisputed evidence was presented that in October 2013, defendant arranged to meet and sell drugs [FN] to Montenegro and Smith and that, during the encounter, defendant shot and killed Montenegro and shot and wounded Smith. Smith participated in the criminal investigation only reluctantly and admitted that when he appeared at the preliminary examination, he lied repeatedly, claiming lack of recollection. Smith testified at trial while being held in custody as a material witness.
>
>> [FN] Defendant was selling prescription cough syrup (promethazine with codeine), known colloquially as "syrup."
>
> The following evidence was presented at trial. Smith testified that both he and Montenegro used syrup regularly. He and Montenegro had purchased syrup from defendant on one prior occasion. On October 4, 2013, he and Montenegro arranged to purchase a high quality syrup from defendant for $500. Defendant arrived at the meeting with two other men. Defendant met Montenegro and Smith near their parked car. Defendant handed Montenegro a bottle of syrup. Smith stated that it was not the high quality product promised; Montenegro indicated that they would take the syrup but also asked defendant about the higher quality product. Defendant said, "It's right here," as he put his hand into a bag and shot at them through the bag. Montenegro was hit first and fell to the ground. Then Smith was hit in his chest. At Montenegro's urging, Smith ran to safety in a neighbor's home. Smith heard gun shots as he was running and heard two or three more shots once inside the neighbor's home. Neither Smith nor Montenegro had a weapon and neither had threatened defendant prior to the shooting.
>
> The neighbor who took Smith into his home called the police. That neighbor testified that he heard two or three shots, "then there was a pause, and then more shots."

---

that order in its August 4, 2020 opinion denying habeas relief. *See id.* at 14.

[2] The Petition was initially dismissed with leave to amend for failure to exhaust. *See* Dkt. No. 19. Following exhaustion of Petitioner's claims, Respondent was ordered to show cause why the Petition should not be granted. Dkt. No. 24.

2

A second neighbor testified that when he heard gunshots he looked out his window and saw a man in a hoodie "hovering over" another man on the ground. The man in the hoodie "was squatting down" and seemed to be patting the person on the ground as if searching for something. The man in the hoodie stood up with something in his hand and started to leave but turned back and fired twice at the man on the ground before leaving the scene.

The autopsy report established that Montenegro was shot three times. The jury was shown a series of photos of Montenegro taken by a crime scene technician after Montenegro had been pronounced dead. In one of the photos, Montenegro's right pants pocket is partially sticking out.

Defendant testified that he had a difficult childhood. His mother was addicted to drugs and he spent time in foster homes before living with his grandmother. He had dropped out of high school during his senior year. He had known Montenegro since middle school. Defendant had been to Montenegro's home and knew that he had guns.

Defendant testified that when he met Montenegro and Smith he was carrying a gun in the same bag as the syrup. He had been given the syrup by his aunt and believed it was the higher quality product, but had not checked for himself. Montenegro and Smith were "anxious, jumpy," as if they were "in a rush." When they realized the product was of a lesser quality than promised there was a "bad vibe," and Montenegro used an aggressive and unfriendly tone. Defendant told them he had to leave and asked for the syrup back. As he put the syrup back in his bag and turned to leave, Montenegro grabbed his left wrist. Defendant yanked his arm back and said, "What the hell are you doing? Why are you grabbing me?" A struggle ensued during which Montenegro grabbed the front of defendant's shirt.

Defendant did not see either man with a weapon, but he thought Montenegro had seen the gun in the bag and that Montenegro was trying to take the gun. Defendant pushed Montenegro away and then, in his peripheral vision, he saw Smith "rushing" at him. Without thinking, defendant reached in the bag and fired in Smith's direction to "scare him off." When Smith ran, defendant did not realize he was hurt. As Smith ran, Montenegro "rush[ed]" at defendant and defendant fired in his direction twice. The first time he fired, Montenegro continued "coming after" defendant. After the second shot, Montenegro clutched his stomach and fell. Defendant had not intended to kill or rob either man. Montenegro pulled out a phone and asked defendant to help him. Defendant bent down and took the phone. Defendant denied reaching into Montenegro's pockets. He acknowledged that he should have helped Montenegro, but cars were driving past so he left. He left the bag with the syrup at the scene but still had the gun and Montenegro's phone when he left. He disposed of both later. Defendant also acknowledged that shortly after his arrest, he attempted to arrange a false alibi.

The defense called Officer Rickey Han as a witness. Han was the first officer to respond to the 911 call and he administered emergency aid to Montenegro until the paramedics arrived.

3

> When asked whether Montenegro's pocket was sticking out when he arrived, Han said he did not recall the condition of Montenegro's clothing. When asked whether the position of the pockets was a detail he would have included in his report, Han responded that he did not believe he would have included that detail in his police report. Defense counsel then questioned Han about whether he had previously told her that he had not seen the pocket sticking out and that, if he had, he would have included it in his report. Han admitted he had previously told her that he would have included that detail in his report, had he observed the pockets sticking out.
>
> The defense also called an expert witness who testified that the levels of promethazine and codeine found in Montenegro's body after his death were indicative of a withdrawal state. She described the symptoms of withdrawal (agitation, anxiety, mood and behavioral changes, aggressive or defensive behavior, and confusion) and opined that it was not uncommon for an individual withdrawing from drugs to go to "great lengths" to obtain the drug, which might include aggressive or violent acts.
>
> The same expert also explained that childhood trauma can increase the risk of an exaggerated fight-or-flight response and can cause one to perceive a situation as dangerous when another person would not. She identified a high number of "adverse childhood experiences" in defendant's social history and opined that she would not be surprised if defendant had an exaggerated response in a potentially threatening situation.

*Hedgepeth*, 2019 WL 4668509, at *1-3.

### III.   DISCUSSION

**A.   Standard of Review**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).[3] In reviewing each claim, the court must examine the last reasoned state court decision that addressed the claim. *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

When a federal claim has been presented to a state court and the state court has summarily denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)). Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then

---

[3] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker v. Fleming*, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).

5

gives deference to those arguments or theories under AEDPA. *Id.* at 102.

**B.     Petitioner's Claims**

Petitioner raises the following two claims in this federal habeas petition: (1) the trial court erred in failing to give instructions on sudden quarrel or heat of passion; and (2) ineffective assistance of appellate counsel for failing to raise the instructional error on appeal.[4] Dkt. No. 5 at 5-6.

1.     <u>Jury Instruction</u>

In his first claim, Petitioner alleges that the trial court had a duty to instruct the jury on voluntary manslaughter based on sudden quarrel or heat of passion, as a lesser included offense to murder, because the evidence warranted such an instruction.[5] Dkt. No. 5 at 5-6. Petitioner raised this claim, along with six other claims, in his habeas petition before the California Supreme Court. *See* Dkt No. 28-14 at 12-17. The California Supreme Court denied the habeas petition as follows:

> The petition for writ of habeas corpus is denied. Individual claims are denied, as applicable. (*See People v. Duvall* (1995) 9 Cal.4th 464, 474 [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [courts will not entertain habeas corpus claims that could have been, but were not, raised on appeal]; *In re Lindley* (1947) 29 Cal.2d 709, 723 [courts will not entertain habeas corpus claims that attack the sufficiency of the evidence].

Ans., Ex. 12.

Respondent contends that this claim is procedurally defaulted. Ans., at 10-11. The Court, in its discretion, reviews the claim on the merits. *See Flournoy v. Small*, 681 F.3d 1000, 1004 n. 1 (9th Cir. 2012) ("While we ordinarily resolve the issue of procedural bar prior to any consideration

---

[4] In his traverse, Petitioner asserts two additional claims based on theories that the jury was presented with prejudicial rap lyrics, and there was insufficient evidence to find him guilty of first-degree murder. *See generally*, Traverse. The Court declines to consider these claims since additional arguments cannot be raised in a traverse. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for relief.").

[5] Under California law, murder is reduced to the lesser offense of voluntary manslaughter when a defendant acted "upon a sudden quarrel or heat of passion[.]" *See People v. Beltran*, 56 Cal.4th 935, 942 (2013) (citations and quotation marks omitted).

6

of the merits on habeas review, we are not required to do so when a petition clearly fails on the merits."); *see also Calderon v. U.S. Dist. Ct.*, 96 F.3d 1126 (9th Cir. 1996) (finding California Supreme Court order that did not specify which claims were barred by which of several state rules considered ambiguous and therefore insufficient to preclude federal collateral review.)  Here, based on the testimony presented at trial, the claim clearly fails on the merits.

### a. Background

Under California law, murder is defined as "the unlawful killing of a human being . . .with malice aforethought."  Cal. Pen. Code § 187(a).  "Malice" exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature," "when no considerable provocation appears" or "when the circumstances attending the killing show an abandoned and malignant heart."  *Id*. § 188.  Manslaughter is defined as "the unlawful killing of a human being without malice" and is deemed voluntary when "upon a sudden quarrel or heat of passion," *id*. § 192(a), or when the perpetrator "kills in 'unreasonable self-defense—the unreasonable but good faith belief in having to act in self-defense[.]'"  *People v. Rios*, 23 Cal.4th 450, 460 (2000) (*quoting People v. Breverman*, 19 Cal.4th 142, 153-54 (1998)).  "These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide."  *Rios*, 23 Cal.4th at 461 (internal quotation marks omitted) (emphasis excluded).  Because a person who kills unlawfully and intentionally, but lacks malice, is guilty of voluntary manslaughter, voluntary manslaughter is a lesser-included offense of murder.  *Id*.

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation."  *People v. Lee*, 20 Cal.4th 47, 59 (1999).  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct reasonably believed by the defendant to have been engaged in by the victim."  *Id*. (internal citation omitted).  "[T]he conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  *Id*.

At trial, the parties discussed with the judge which jury instructions were applicable to the

case. The judge noted the two types of voluntary manslaughter — heat of passion and imperfect self-defense — and found that while imperfect self-defense applied, he was not sure whether "there [wa]s enough evidence to support the heat of passion." Dkt. No. 28-4 at 1172. After hearing from the parties, the trial court declined to give the instruction, explaining:

> With regard to the instruction on voluntary manslaughter and heat of passion, the Court has given this some significant thought. For the duty to give this instruction to arise, there must be substantial evidence, which means evidence that a reasonable jury would find persuasive.
>
> There are two components to the heat of passion defense, so to speak: A subjective one and an objective one. They are discussed at great length in many cases, one of which obviously the Court is very familiar with. *People versus Millbrook*. Just to summarize in that case, there was a very heated argument at a party, intense argument between the victim and the defendant and his girlfriend, which the victim was bigger than the defendant, was clenching his fists. He lunged at the defendant. He told the defendant to check his bitch. He threatened the girlfriend. The defendant in that case testified that there were past incidents in which he was attacked, and he felt under siege, so to speak, and that's why he acted the way he did. So that's not his case.
>
> In *People v. Barton*, the defendant -- excuse me. In *People versus Barton*, a daughter told her father that the victim had tried to run her off the road, spat on the window, called her a bitch, acted berserk. The defendant and the victim confronted each other in a fighting stance, and the Court found that that was sufficient for giving the heat of passion instruction. I don't believe that's this case.
>
> In *People v. Thomas*, there was a heated argument here in Oakland over a parking space. One of the friends attacked the defendant and beat him, picked him up, threw him to the ground. The victim lunged at the defendant. There was profanity back and forth. And as I indicated, a physical attack.
>
> In this case, Mr. Hedgepeth indicated that he shot Mr. Montenegro because he was scared. And primarily because he thought that he was going for the gun that was in his bag. He thought that Mr. Montenegro perhaps had seen that gun.
>
> The record is clear that Mr. Montenegro -- neither Mr. Montenegro nor Mr. Smith threatened Mr. Hedgepeth. Neither of them had a gun or any other kind of weapon. And they know each other. They were friends; Mr. Montenegro and Mr. Hedgepeth. They'd never had any past incidents that were uncomfortable or that were violent between them. Mr. Montenegro had never threatened Mr. Hedgepeth in the past.
>
> And, so, this case, I believe, is more -- somewhat similar just in general terms to the case of *People versus Moi* at 47 Cal.4th in which

8

> case -- in that case, the defendant shot somebody because he thought he was going for a gun, which is very similar to this case. It's purely a self-defense situation. Mr. Hedgepeth felt that he was in fear for his safety or perhaps at the risk of suffering death or great bodily injury, I'm assuming, because Mr. Montenegro made a grab for the bag on the second occasion when he grabbed him. He grabbed his wrist once. Mr. Hedgepeth flipped it off and pushed him back. Mr. Montenegro stumbled a little bit apparently, came back towards Mr. Hedgepeth, grabbed his wrist again or shirt, and may have at some point reached for the bag. Mr. Hedgepeth thought he saw a gun that was inside, and Mr. Hedgepeth reacted in the manner that he has described.
>
> The jury will be asked to decide whether that is sufficient for justifiable self-defense, and they'll also receive an instruction on imperfect self-defense.

Dkt. No. 28-5 at 227-29.

### b. Analysis

Petitioner contends that the trial court erred in failing to instruct the jury on voluntary manslaughter based on heat of passion. Petitioner's instructional error claim does not merit habeas relief. Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A criminal defendant is entitled to adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnapping where such instruction was supported by the evidence). However, due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982). Nor is the defendant entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory. *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

Instructional errors are subject to harmless error analysis. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 (2008); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). An instructional error is considered harmless unless there is a "reasonable probability" that the jury would have arrived at a different verdict had the instruction been given. *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009).

The Court first notes that the failure to instruct on a lesser-included offense in a non-capital case is generally insufficient to constitute a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). Furthermore, a review of the record establishes that the defense theory of the case was adequately covered by the self-defense and imperfect self-defense instructions. Under these instructions, the jury was permitted to consider whether Petitioner believed he was in imminent danger, and the use (or attempted use in the case of Smith) of deadly force was necessary to defend against the danger. Dkt. No. 28-5 at 542-50; 558-59. During his testimony, Petitioner repeatedly emphasized that he shot the victims because he felt afraid. Dkt. No. 28-4 at 657, 736, 742. He testified that he had previously seen Montenegro with guns, and he knew Montenegro and his family were "gang-related." *Id*. at 745. He recounted the events leading up to the shooting, testifying that Smith and Montenegro were acting "off" and after Petitioner handed them the syrup, Smith tasted it, the two passed it back and forth, and looked at Petitioner strangely. *Id.* at 732-33. Smith and Montenegro then asked Petitioner in an "aggressive" tone where the Actavis was. *Id.* at 733-34. After further conversation, Petitioner told Montenegro he had to leave and asked for the syrup back. *Id.* at 736. After Montenegro returned the syrup, Montenegro grabbed Petitioner's arm with one hand and grabbed "towards the handle of the bag with his other hand." *Id*. at 732-33, 739. Petitioner felt "scared . . . I was shaking." *Id*. at 736. Petitioner explained that he had placed a gun in the bag, and he knew Montenegro had seen the gun in the bag because "I had to get the syrup out of the bag and [Montenegro] looked in. So I was afraid [Montenegro] was going for the gun in the bag." *Id*. at 745. Petitioner then testified that he yanked his arm back and Montenegro grabbed him a second time, which made Petitioner "afraid. I was scared." *Id*. at 741-42. Petitioner explained that he pushed Montenegro off him and then observed Smith rushing at him. *Id*. at 750. Petitioner then

testified that he put his hand in his bag "and kind of lifted it [the gun] up and just fired in his way." *Id*. After Smith ran away, Montenegro rushed toward Petitioner and Petitioner fired his gun twice at Montenegro. *Id*. On cross-examination, Petitioner affirmed that he did not see Smith or Montenegro with guns, and that neither victim threatened Petitioner. *Id*. at 770. Petitioner also affirmed that he shot in the direction of Smith because he was scared for his life and believed Montenegro was going for the gun in Petitioner's bag. *Id*. at 839-40. At closing, defense counsel argued self-defense, emphasizing that Petitioner made a "split-second decision . . . to protect himself . . . act[ing] in self-defense." Dkt. No. 28-5 at 287.

As noted above, Petitioner contends that the trial court erred when it failed to instruct on heat of passion. However, the evidence adduced at trial was insufficient to support a heat of passion instruction. Heat of passion under California law requires an "adequate provocation." *People v. Beltran* (2013) 56 Cal.4th 935, 942. As the trial court aptly noted, there was nothing to indicate that Smith or Montenegro threatened Petitioner. In addition, Petitioner's past friendship and dealings with Montenegro had always been without incident. Petitioner testified that he was good friends with Montenegro throughout middle school and high school and had been to Montenegro's house and knew his family. Dkt. No. 28-4 at 677-81. Petitioner also testified that he had sold syrup to Montenegro twice before, and the sales were "brief" without incident. *Id*. 681-85. When selling syrup to Montenegro in the past, Petitioner placed the syrup in a blue Walmart garbage bag, identical to the bag he was carrying the syrup in on the night of the shooting. *Id*. at 684-88. Overall, the record is devoid of evidence showing adequate provocation, *i.e.*, conduct "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." *Lee*, 20 Cal.4th at 59.

In addition, even if the Court could assume somehow that the trial court erred by failing to instruct the jury on heat of passion voluntary manslaughter, Petitioner still is not entitled to relief, because any such error would have been harmless. *See Brecht*, 507 U.S. at 637. While Petitioner does not delineate what evidence he believes supported a heat of passion instruction, Petitioner likely relies on the fact that the victims spoke to him in an aggressive tone, he felt scared when Montenegro grabbed him and the bag, and he observed Smith and Montenegro rush at him. This

evidence is essentially the same evidence that Petitioner relied on to support his imperfect self-defense argument.  As noted above, defense counsel relied on this evidence at closing to support self-defense.  The trial court properly instructed the jury on the defense theory of voluntary manslaughter based on imperfect self-defense, which the jury rejected.  Thus, it is reasonable to conclude that the jury would have returned a murder verdict even if instructed on heat of passion voluntary manslaughter.

Thus, while Petitioner may have wanted the additional instruction, the instructions in this case were adequate to encompass the defense theory of the case and Petitioner fails to show that he was prejudiced by the alleged instructional error.  *See Del Muro*, 87 F.3d at 1081; *Brecht*, 507 U.S. at 637.  Accordingly, habeas relief is DENIED on this claim.

### 2. Ineffective Assistance of Appellate Counsel

Petitioner argues that appellate counsel was ineffective in failing to raise a claim of instructional error on appeal.  Dkt. No. 5 at 5-6.  He claims that he repeatedly asked appellate counsel to argue that the trial court erred in failing to instruct on heat of passion/sudden quarrel but failed to do so.  *Id*.

Petitioner raised this claim in his habeas petition before the California Supreme Court.  *See* Dkt No. 28-14 at 24-26.  As noted in Section IIIB1, above, the California Supreme Court denied the claim, citing various California state law cases.  Ans., Ex. 12.  To the extent this claim is procedurally defaulted, the Court, in its discretion, denies the claim on the merits.  *See Lambrix*, *supra*, 520 U.S. at 525.

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  *Smith*, 528 U.S. at 285-86; *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th

12

Cir. 2010). Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

The Court has found Petitioner's instructional error claim to be without merit. Thus, even if Petitioner could demonstrate that the failure to raise this claim was objectively unreasonable, Petitioner cannot show prejudice. The Court's denial of the claim on the merits indicates that the failure to prevail in his appeal was not due to appellate counsel's failure to raise this claim. For these reasons, habeas relief is DENIED on this claim.

## IV.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall enter judgment in favor of Respondent, terminate any pending motions, and close the file.

**IT IS SO ORDERED.**

Dated: March 14, 2022

BETH LABSON FREEMAN
United States District Judge